# <u>EXHIBIT A</u>

CIRCUIT COURT SUMMONS                                          NASHVILLE, TENNESSEE

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20ᵀᴴ JUDICIAL DISTRICT

Service ID 269469

Service ID 269469

T-MOBILE USA, INC. D/B/A T-MOBILE

                                          Plaintiff

vs.

T-MOBILE USA, INC. D/B/A T-MOBILE
CORPORATION SERVICE COMPANY
2908 POSTON AVE
NASHVILLE TN, TN 37203

                                          Defendant

CIVIL ACTION
DOCKET NO. 21C2273
Method of Service:
  Certified Mail

To the above named Defendant:

You are summoned to appear and defend a civil action filed against you in the Circuit Court, 1 Public Square, Room 302, P.O. Box 196303, Nashville, TN 37219-6303 , and your defense must be made within thirty (30) days from the date this Summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgment by default will be rendered against you for the relief demanded in the Complaint.

ISSUED:  12/23/2021

RICHARD R. ROOKER
Circuit Court Clerk
Davidson County, Tennessee

By: _____

_____
Deputy Clerk

ADDRESS OF PLAINTIFF'S ATTORNEY OR PLAINTIFF:

RICHARD J. KESHIAN
KILPATRICK TOWNSEND & STOCKTON LLP
1001 WEST FOURTH STREET
WINSTON-SALEM, NC 27101

---

**NOTICE TO THE DEFENDANT:**
Tennessee law provides a Ten Thousand and 00/100 Dollars ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

---

## CERTIFICATION

STATE OF TENNESSEE )
COUNTY OF DAVIDSON )

I, Richard R. Rooker, Clerk of the Circuit Court in the State and County aforesaid, do hereby certify this to be a true and correct copy of the original summons issued in this case.

COPY



RICHARD R. ROOKER, CLERK

By: _____ D.C.

To request an ADA accommodation, please contact Dart Gore at (615) 880-3309

Service ID 269469

EFILED 12/23/21 10:41 AM CASE NO. 21C2273 Richard R. Rooker, Clerk

CIRCUIT COURT SUMMONS                                    NASHVILLE, TENNESSEE

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20 TH JUDICIAL DISTRICT

Service ID 269469

Service ID 269469

T-MOBILE USA, INC. D/B/A T-MOBILE

Plaintiff

vs.

T-MOBILE USA, INC. D/B/A T-MOBILE
CORPORATION SERVICE COMPANY
2908 POSTON AVE
NASHVILLE TN, TN 37203

Defendant

CIVIL ACTION
DOCKET NO. 21C2273
Method of Service:
 Certified Mail

### RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____, 20___, I sent, postage prepaid by registered return receipt mail or certified return receipt mail, a certified copy of the Summons and a copy of the Complaint/Petition in Docket No. 21C2273 to the Defendant, T-MOBILE USA, INC. D/B/A T-MOBILE . On the _____ day of _____, 20___, I received the return receipt for said registered or certified mail, which had been signed by _____ on the _____ day of _____, 20___. Said return receipt is filed with the original Summons Return and both documents are being sent herewith to the Circuit Court Clerk for filing.

SWORN TO AND SUBSCRIBED BEFORE ME, ON THIS
PERSON

_____ DAY OF _____, 20____.

_____

_____ NOTARY PUBLIC or _____DEPUTY CLERK
MY COMMISSION EXPIRES: _____

_____
PLAINTIFF, PLAINTIFF'S ATTORNEY or OTHER

AUTHORIZED BY STATUTE TO SERVE PROCESS

To request an ADA accommodation, please contact Dart Gore at (615) 880-3309

## IN THE CIRCUIT COURT FOR DAVIDSON COUNTY
## AT NASHVILLE
### Docket No. _____

| | |
|---|---|
| ABSOLUTE WIRELESS OF TENNESSEE LLC, | |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| T-MOBILE USA, INC. d/b/a T-MOBILE, and SPRINT SOLUTIONS, INC. n/d/b/a T-MOBILE, | |
| Defendants. | |

### COMPLAINT

Plaintiff Absolute Wireless of Tennessee LLC, ("Absolute Wireless" or "Plaintiff") complaining of Defendants T-Mobile USA, Inc. d/b/a T-Mobile ("T-Mobile") and Sprint Solutions, Inc., n/d/b/a T-Mobile ("Sprint") (T-Mobile and Sprint are each a "Defendant" and collectively "Defendants"), alleges the following:

### INTRODUCTION

1. Absolute Wireless brings this action to recover for T-Mobile's and Sprint's pattern and practice of predatory business practices that destroyed Absolute Wireless's business as an authorized dealer of mobile services and products, ultimately forcing the principals of Absolute Wireless to sell their company after successfully running it for 22 years.

2. Using unethical and unlawful tactics, T-Mobile shuttered more than 20 small businesses, closed well over 1,000 dealer-owned doors, caused thousands people to lose their jobs, and negatively impacted numerous consumers locally and throughout the United States.[1] The

---

[1] The harm was especially prevalent to lower credit and rural customers.

1

question presented for this tribunal is whether a big and powerful wrongdoer can use fraudulently-induced, coercive, dishonest, and misapplied contracts to cheat its counterparties.

3. Prior to May 2020, Absolute Wireless operated Sprint-branded wireless-services and accessories stores pursuant to an Authorized Representative Agreement with Sprint. After Sprint and T-Mobile merged, Sprint and T-Mobile used fraud, deception, and improper business compulsion to force Absolute Wireless to become a dealer of T-Mobile services and products on non-negotiable and unfair terms that T-Mobile wrongfully imposed.

4. Private and authorized dealers like Absolute Wireless commonly sell wireless products and services. These small to medium sized, often family-owned businesses, provide numerous employment opportunities in the communities in which they are located – a high percentage of which are jobs for minorities and persons of color.[2]

5. Unfortunately for Absolute Wireless and other comparably-situated dealers, upon information and belief, T-Mobile wanted Sprint's cellular network and customers, but not, as a general rule, Sprint's dealers. T-Mobile generally preferred to work with the existing T-Mobile dealers with which it had existing relationships, and wanted to reduce the compensation, size, and market share of the legacy Sprint dealers like Absolute Wireless without paying full value for the store reductions and lost value T-Mobile caused, and indeed, mandated.

6. Accordingly, after the merger, T-Mobile forced Absolute Wireless and other dealers out of their existing Sprint contracts, which had years remaining on their terms and which were more favorable than T-Mobile's contracts. Indeed, even though T-Mobile had acquired the Sprint contracts as a successor and was legally bound to follow them, T-Mobile wrongfully told

---

[2] T-Mobile touts its pro-diversity positions, but contrary to these representations (and the promises it made to be permitted to merge with Sprint), its post-merger decimation of legacy Sprint dealers has resulted in a disproportionately large loss of jobs held by minorities and persons of color.

2

the legacy Sprint dealers, including Absolute Wireless, that it did not have to and would not honor those Sprint contracts, and it would not permit them to sell any wireless products and services (thereby condemning their businesses) unless those dealers signed unfavorable one-sided contracts with T-Mobile replacing the still valid Sprint contracts that T-Mobile assumed through the merger. If Absolute Wireless or other legacy Sprint dealers refused, T-Mobile told them they would still be bound by the restrictions and burdens under their Sprint contracts (although they would not be allowed to sell any products or services), including the non-compete provisions that forbid the dealers from leaving T-Mobile and going to another carrier.

7. T-Mobile was in possession of Absolute Wireless's (and other legacy Sprint dealers') financial information, strategic background information, and plans for the future, and was fully aware that T-Mobile's undisclosed plans to suppress Absolute Wireless's success and to close a completely unreasonable number of Absolute Wireless's stores would result in the destruction of Absolute Wireless's business. T-Mobile thus fraudulently concealed its plans from Absolute Wireless, and made affirmative representations to further mislead and conceal from Absolute Wireless (and other legacy Sprint dealers) T-Mobile's intention to dismantle their business, eliminate growth opportunities, and to not honor the letter and the spirit of the new T-Mobile agreement in good faith, with the ultimate goal of driving Absolute Wireless (like other legacy Sprint dealers) out of business.

8. Absolute Wireless and other legacy Sprint dealers faced financial devastation if they did not agree to T-Mobile's take-it-or-leave-it terms. Because the Sprint contracts included harsh non-competition clauses, Absolute Wireless lacked the ability to go to another carrier and continue operations. Because, like all dealers, Absolute Wireless faced significant, recurring monthly expenses for lease payments, payroll, taxes, and debt service, dealers could not afford to

3

forego the income from selling wireless services and products. In Absolute Wireless's case, these recurring payments amounted to approximately $1.5 million per month.

9.     T-Mobile rushed Absolute Wireless and other legacy Sprint dealers into unlawfully hurried contracts of adhesion (to the point of requiring Absolute Wireless to execute a nearly 700-page set of important legal documents[3] within only a few days of receiving same) that included unfair, unreasonable, and unconscionable terms which were, in any event, the product of coercion, fraud, financial distress and inequality that T-Mobile created. Those contracts (collectively, "the Agreement Package") included:

> a. A Wind Down Addendum to the Authorized Representative Agreement between Sprint and Absolute Wireless ("Wind Down Addendum");[4]
>
> b. Retailer Services Agreements[5] with T-Mobile, which in turn had numerous, lengthy exhibits – Agreements that were far less favorable than the Sprint Agreement they purported to replace; and
>
> c. Personal guarantees (which Sprint had not required) for Mr. Grant Burrow and Mr. Robert Hartline, Absolute Wireless's principals.

---

[3] Not only were the documents themselves lengthy, but they also included links to other documents and terms and conditions which were not set out in the documents themselves. No reasonable person – or even a reasonable lawyer representing a dealer—could have been fully familiar with all of the documents T-Mobile was pressuring Absolute Wireless to sign in a rushed fashion, particularly given the unfair timing restraints T-Mobile was imposing. Of course, it would have made little difference since dealers like Absolute Wireless had no choice but to sign and T-Mobile indicated that the documents were non-negotiable and that it would accept no edits from dealers whatsoever.

[4] The Wind Down Addendum was horribly one-sided. It provided limited "door closing benefits" for stores (referred to in the business as "doors") that Absolute Wireless did not want to close, and disproportionately took away benefits for those stores that Absolute Wireless had always enjoyed under the Sprint Agreements. For example, the Wind Down Addendum robbed Absolute Wireless of continuing service awards ("CSAs" or "residuals") for the doors, which were monthly amounts received by dealers for each wireless service agreement contract they sold to a customer. Under Sprint, Absolute Wireless received residuals for a customer sale at a location even after that location closed. Under T-Mobile, Absolute Wireless did not.

[5] The parties executed three Retailer Services Agreements, one for each market or "Area" where Absolute Wireless operated retail locations. All three Retailer Service Agreements are virtually identical and, for the purposes of this Complaint, will be referred to collectively as " the Agreement."

4

The undersigned has not attached these documents but can make them available to the Court.

10.     T-Mobile then abused the putative commercial terms it imposed to suppress Absolute Wireless, impede its success, and to force the closures of a disproportionately high number of Absolute Wireless locations. These were the mechanisms T-Mobile employed (via the guise of exercising its purported rights under the fraudulently-obtained Agreement) to carry out its ultimate scheme of financially crippling Absolute Wireless — and numerous other previously-thriving legacy Sprint dealers — to such an extent that Absolute Wireless was forced to sell its remaining business to one of T-Mobile's preferred legacy dealers. Specifically, T-Mobile unlawfully weaponized the commercial relationship and used the Agreement's terms to unfairly disadvantage Absolute Wireless when it, without limitation:

  a.  Closed Absolute Wireless's best stores;

  b.  Systematically closed Absolute Wireless's stores at such high, unfair, and unforeseeable (to Absolute Wireless) rates that it effectively drove Absolute Wireless into financial hardship and out of business;

  c.  Cut stores in large geographies in a manner that made it nearly impossible for Absolute Wireless's district managers to reasonably operate in those geographies;

  d.  Took away Absolute Wireless's CSAs or residuals, which were a significant aspect of Absolute Wireless's compensation as a Sprint dealer;

  e.  Provided deficient signage for the stores after the merger, initially providing only a banner, which was far less effective than real signage at encouraging customer traffic. In fact, T-Mobile intentionally delayed providing T-Mobile-branded signage to Absolute Wireless, leaving it with Sprint-branded signage

5

even after the merger, resulting in enormous financial loss as customers perceived Absolute Wireless as being non-functional. Absolute Wireless faced approximately a 30% drop in call volume as a result;

f. Took control of internet marketing for Absolute Wireless, but then impaired Absolute Wireless's search engine optimization so that internet searches for T-Mobile services only returned hits for legacy T-Mobile stores, but not Absolute Wireless (even if an Absolute Wireless location was closer), and only persons searching specifically for Sprint Services (which had been merged out of existence) would be directed to Absolute Wireless;

g. Cut real-time sales reporting, one of the single most important sales drivers in the retail mobile services and accessories business, which impaired Absolute Wireless's ability to gauge its success in real time and its ability to prevent returns that undermined final sales;

h. Limited the number of point-of-sale stations in Absolute Wireless's stores, which reduced sales opportunities;

i. Changed the credit class for Absolute Wireless's upgrading legacy Sprint customers, which prevented Absolute Wireless from upgrading its own customers to new services or products;

j. Created an atmosphere that depressed the sales value of dealer-dealer sales of stores, which:

(1) artificially reduced the prices that Absolute Wireless could receive for selling its locations to other dealers when T-Mobile's misconduct was driving Absolute Wireless out of the marketplace,

(2) improperly reduced the number of viable, successful dealers who could purchase Absolute Wireless's assets, and

6

(3) encouraged T-Mobile-preferred dealers to offer artificially low prices for the remaining stores Absolute Wireless (and other legacy Sprint dealers) were forced to sell off as a result of T-Mobile's conduct;[6]

k.  Engaged in other improper actions and inactions that demoralized Absolute Wireless's ownership, management, and staff; and

l.  Otherwise engaged in oppressive, fraudulent, and unconscionable conduct.

11.  T-Mobile both affirmatively misrepresented the number of contemplated store closures and concealed that it intended to devastate Absolute Wireless's business by cutting its total presence from 57 stores to 38 stores.

12.  T-Mobile made affirmative misrepresentations and concealed material facts regarding its devastating intentions from dealers such as Absolute Wireless, and these frauds induced the alleged contractual relationships that T-Mobile then abused. For instance, T-Mobile knew Absolute Wireless and other legacy Sprint dealers would resist signing the Agreement after the merger if they knew T-Mobile would quickly close the majority of their stores, and so T-Mobile told those dealers under no uncertain terms that it would *not* do so, despite knowing at the time that it would.

13.  Further, Absolute Wireless was in a mislabeled and fraudulently disclaimed (by Sprint) franchise relationship with Sprint. T-Mobile unlawfully terminated that franchise relationship and required Absolute Wireless to enter into another mislabeled and fraudulently

---

[6] T-Mobile's Dealer Financial Services had complete knowledge of the sales and purchases being contemplated among dealers and total control over which deals would be approved. The overreaching control exercised by Dealer Financial Services led to circumstances in which Absolute Wireless encountered difficulty receiving reasonable bids for the sale of its stores, and created an environment in which one bidder felt comfortable breaching an NDA to invite other dealers to collaborate with that dealer to offer Absolute Wireless a low-ball value rather than competing bids. Such unfair and anti-competitive circumstances would not have been possible had T-Mobile not destroyed the open marketplace for dealer-dealer sales through its actions and inactions complained of herein. Thus, not only was T-Mobile's conduct unlawful, unfair, and improper, but it facilitated and promoted an environment of misconduct by others.

7

disclaimed (by T-Mobile) franchise relationship with T-Mobile. T-Mobile has acted unlawfully under franchise law.

14.     Ultimately, and precisely according to T-Mobile's plan, T-Mobile's unlawful conduct forced Absolute Wireless to exit the business of being a T-Mobile dealer after the short and commercially abusive relationship by making a significantly de-valued sale of its remaining assets in December 2020.

15.     Before bringing this case, Absolute Wireless served a notice of dispute on T-Mobile and tried to resolve these issues without resorting to filing this Complaint. T-Mobile offered only conclusory rejections of Absolute Wireless's valid concerns and refused to negotiate a reasonable resolution in good faith. Accordingly, Absolute Wireless has no choice but to bring an action to obtain redress for the wrongs T-Mobile inflicted via its predatory and anti-competitive conduct.[7]

## PARTIES, VENUE, AND JURISDICTION

16.     Plaintiff Absolute Wireless is a limited liability company organized and existing under the laws of Tennessee and with a principal place of business in Tennessee.

17.     Defendant T-Mobile is a corporation organized and existing under the laws of Delaware, with its headquarters in Bellevue, Washington.

18.     Defendant Sprint is a is a Missouri corporation with its principal place of business at 6200 Sprint Parkway, Overland Park, Kansas 66251.

19.     Venue is proper in Davidson County pursuant to Tenn. Code Ann. §§ 20-4-104.

---

[7] T-Mobile will attempt to normalize and justify its misconduct by describing it as sound business judgment. T-Mobile's conduct was neither sound nor legitimate. The business judgments T-Mobile made were to cheat, deceive, mistreat, suppress, and effectively shut down Absolute Wireless and other legacy Sprint dealers.

20.    This Court has personal jurisdiction over Sprint and T-Mobile pursuant to Tenn. Code Ann. §§ 20-2-201 and 20-2-203 as Sprint operated stores and did substantial business in Tennessee, and T-Mobile operates and does substantial business in Tennessee.

21.    This Court has general jurisdiction of this matter pursuant to Tenn. Code Ann. § 16-10-101.

**CHOICE OF LAW**

22.    The Agreements provide for a Washington state choice of law. But those Agreements should be set aside as fraudulent and otherwise unlawfully and coercively induced. Absolute Wireless, therefore, is not bound by the Washington choice of law provision. T-Mobile, however, is estopped from refusing application of Washington law where it is more favorable to Absolute Wireless. Without waiving its rights to contest the T-Mobile Agreements, Absolute Wireless brings claims under both Washington law and the laws of the states in which did business and suffered harm, including in Tennessee.

**FACTUAL BACKGROUND**

**A.    Founding of Absolute Wireless and Establishment of Absolute Wireless's Relationship with Sprint.**

23.    In 1999, Messrs. Robert Hartline and Grant Burrow entered the wireless business offering wireless products and services as authorized Nextel dealers. Mr. Hartline owned and operated Absolute Wireless and Mr. Burrow owned and operated Wireless Direct.

24.    In 2016, Messrs. Hartline and Burrow merged and established Absolute Wireless in Tennessee as an exclusive provider of Sprint products and services after Nextel and Sprint merged. The new Absolute Wireless had a combined total of 33 stores at the time the two companies merged.

9

25.     Sprint began to recognize Absolute Wireless's success and promise and awarded it numerous awards over the years for being one of the top dealers in the country.

26.     On or about August 30, 2017, Sprint and Absolute Wireless executed an Authorized Representative Agreement ("ARA"), which Sprint could terminate only for cause.

**B.     Absolute Wireless Exceled as an Authorized Sprint Dealer and Expanded its Footprint at Sprint's Behest.**

27.     At a dealer summit that took place during January 29-31, 2018, Sprint heavily encouraged dealers, including Absolute Wireless, to grow and add new locations, especially near competitors like T-Mobile. In light of Absolute Wireless's track record of success, Sprint encouraged Absolute Wireless to expand in markets that Sprint considered strategic or beneficial to Sprint. Sprint consistently ranked Absolute Wireless as one of its top dealers in the country, and over time, Absolute Wireless received numerous awards for being one of the best Sprint dealers in the country. Over time, Absolute Wireless grew to 57 stores across Arkansas, Tennessee, Alabama, Mississippi, and Georgia, with over 300 employees.

**C.     While Encouraging Absolute Wireless to Expand, Sprint Concealed Its Plans to Merge with T-Mobile.**

28.     Sprint knew that it would soon be acquired by T-Mobile, but told Absolute Wireless otherwise, assuring Absolute Wireless (and other legacy Sprint dealers) that Sprint would remain "a stand-alone company." Indeed, Sprint's CEO Marcelo Claure specifically made this statement. Sprint concealed the truth about the merger from Absolute Wireless (and other dealers) and repeatedly encouraged Absolute Wireless to open and acquire new stores, and specifically encouraged Absolute Wireless (and other dealers) to open stores that were in close proximity to T-Mobile stores. Upon information and belief, these misrepresentations and concealments were made to protect Sprint's position in the merger as well as profit Sprint and its executives in the

10

coming merger, from which they profited greatly based on the growth induced by the misrepresentations and concealments.

29.     Despite Sprint's efforts to conceal its merger plans from dealers like Absolute Wireless, there were rumors that Sprint and T-Mobile might merge. Sprint indicated that there would not be a merger, and again instructed Absolute Wireless to continue growing and opening new stores  in close proximity to T-Mobile locations. Absolute Wireless followed Sprint's instructions and continued opening new locations. Upon information and belief, Sprint knew its statements about the merger were false and that its repeated urging that Absolute Wireless (and other legacy Sprint dealers) continue growing and opening new stores would benefit Sprint and its executives in the upcoming merger, but would ultimately harm dealers like Absolute Wireless.

30.     To obtain the necessary approvals from the Department of Justice and regulatory agencies, T-Mobile made broad, sweeping promises to the government and to the public that the merger would increase competition for consumers, result in the opening of new stores, and create approximately 100,000 new jobs and that it would not produce anti-competitive behavior.

31.     Among other public appearances to promote the merger, Marcelo Claure and T-Mobile's CEO John Legere, jointly appeared on CNBC's "Squawk on the Street" program on April 30, 2018. During that joint appearance, they stated that the new proposed merger would create thousands of jobs and would result in hundreds and hundreds of new stores being opened. A link to the video of program where these statements was made is here - https://www.cnbc.com/video/2018/04/30/T-Mobile-and-sprint-ceos-on-mega-merger.html.     Mr. Claure's and Mr. Legere's statements on that program are incorporated by reference.

32.     Messrs. Claure and Legere made the same claims – that both jobs and stores would be added, not reduced, following the merger – during a Town Hall meeting with Sprint dealers,

11

including Absolute Wireless, on October 22, 2018. The full transcript of their statements at that meeting is available here - https://www.fiercewireless.com/wireless/full-transcript-here-s-what-T-Mobile-s-john-legere-told-sprint-s-town-hall-meeting, and is incorporated by reference.

33.     Mr. Legere additionally stated that "The New T-Mobile will open **600 new stores to serve rural areas and small towns**" (emphasis in original) and that "we will offer a job with the New T-Mobile to every single employee of T-Mobile and Sprint working in one of our retail stores" following the merger during an April 4, 2019 posting to T-Mobile's website - https://www.T-Mobile.com/news/un-carrier/new-T-Mobile-creating-jobs, which statements are also incorporated herein.

34.     Messrs. Claure and Legere made these statements to induce Absolute Wireless, and other legacy Sprint dealers, to continue following Sprint's growth plan and to induce Absolute Wireless and other dealers to not oppose the merger or request that appropriate regulators deny or contest the merger.

35.     Messrs. Claure and Legere intended that Absolute Wireless and other Sprint dealers rely on these representations in executing post-merger agreements with T-Mobile so they could complete their merger and enrich themselves, to the detriment of legacy Sprint dealers like Absolute Wireless.

36.     Messrs. Claure and Legere also intended that Congress rely on these statements, as well as those made in other public appearances and interviews, because they knew the merger would be subject to scrutiny by Congress. In fact, Messrs. Claure and Legere reiterated their claims that the merger would not impact Sprint dealers and would in-fact result in more stores being opened, during joint testimony sessions to Congress on June 27, 2018 and February 19, 2019.

12

37.     Sprint concealed the truth about the merger from Absolute Wireless (and other dealers) and repeatedly encouraged Absolute Wireless to open and acquire new stores, and specifically encouraged Absolute Wireless (and other dealers) to open stores that were in close proximity to T-Mobile stores.

38.     Upon information and belief, these misrepresentations and concealments were made to profit Sprint and its executives in the coming merger, from which they profited greatly based on the growth induced by the misrepresentations and concealments.

**D.      Sprint and T-Mobile Merged, and T-Mobile Coerced and Fraudulently Induced Absolute Wireless to Enter Into New Agreements Based on False Promises of Growth and Limited Post-Merger Closures.**

39.     Sprint and T-Mobile finalized the merger on April 1, 2020.

40.     Approximately on or about April 30, 2020, representatives from T-Mobile met with Absolute Wireless to present T-Mobile's post-merger dealer strategy as it pertained to Absolute Wireless. In the presentation, T-Mobile announced it would close 10 of Absolute Wireless's 57 stores. T-Mobile falsely represented that the store closures were based on extreme proximity to other T-Mobile stores and that T-Mobile was instituting a similar number of closures for legacy Sprint and T-Mobile dealers alike.

41.     T-Mobile had designated monthly bonus payments for those stores it classified as rural. Despite classifying all but four of Absolute Wireless's stores as rural, T-Mobile never made any bonus payments to Absolute Wireless that it was entitled to.

42.     T-Mobile did not mention the possibility of additional store closures beyond those 10. Absolute Wireless reasonably believed that these closures were the only closures T-Mobile would institute because T-Mobile's dealer strategy presentation to Absolute Wireless — besides not mentioning any potential for more closures — was intentionally designed to give the impression there would be none.

13

43.     On or about May 5, 2020, T-Mobile sent Absolute Wireless the Agreement Package, which required Absolute Wireless to wind down its existing agreements with Sprint, enter into three new Retailer Services Agreements with T-Mobile, and submit two individual guarantees executed by Mr. Hartline and Mr. Burrow. The Agreement Package consisted of hundreds of pages of legal documents. T-Mobile pressured Absolute Wireless to sign these documents quickly and repeatedly emphasized that all terms were non-negotiable and that to be a T-Mobile authorized dealer, Absolute Wireless must sign these Agreements.[8]

44.     Contemporaneously with its transmission of the Agreement Package, T-Mobile falsely represented to Absolute Wireless that it did not have to honor and would not honor Sprint's obligations under Absolute Wireless's existing dealer agreements with Sprint, which obligations T-Mobile had assumed via the merger and by their terms were effective and would have continued to remain effective.

45.     T-Mobile also withheld Absolute Wireless's rightfully-earned CSAs for those 10 closed stores, amounting to approximately $70,000 on a monthly basis yet at the same time wrongfully charged Absolute Wireless fees for deactivations and chargebacks for the closed locations.

46.     T-Mobile further advised Absolute Wireless that, because Sprint no longer existed, T-Mobile was not obligated to provide any benefits under the existing contracts and would not allow Absolute Wireless to sell any T-Mobile phones or services unless it signed the Agreement

---

[8] Absolute Wireless had no legitimate option of suing T-Mobile to avoid signing the Agreements, because, if it did not sign them, Absolute Wireless would lack the cash flow from selling wireless services and products that it would have needed to fund litigation against T-Mobile and Sprint, which were, conversely, well capitalized to resist a challenge (and draw it out and punish Absolute Wireless). Indeed, as set forth in this complaint and similar pleadings against T-Mobile, T-Mobile has a pattern and practice of unlawfully retaliating against dealers that stand up to it.

Package. T-Mobile took the entirely opposite position with respect to Absolute Wireless's burdens under the existing Sprint contracts, stating it would continue to enforce those burdens against Absolute Wireless until it signed the T-Mobile Agreement Package.

47.     T-Mobile also stated that if Absolute Wireless did not execute the Agreement Package by May 8, 2020 (effectively giving Absolute Wireless a 3-day deadline to read, understand, and execute hundreds of pages of legal documents, or else risk having a worthless business with no ability to sell products or services), T-Mobile would withhold the funds needed to remodel Absolute Wireless's 47 remaining stores to convert them to T-Mobile-branded locations. T-Mobile required all legacy Sprint dealers, including Absolute Wireless, to remodel their stores under the new T-Mobile brand at a cost to the dealer of an undisclosed amount at the time, but which later information revealed would cost approximately more than $100,000 per store. At the time, T-Mobile misrepresented that it would allocate cooperating legacy Sprint dealers funds to "refresh" their stores, which concealed the true cost of remodeling.

48.     T-Mobile therefore gave Absolute Wireless an unrealistic and impractical timeline to review and execute voluminous, non-negotiable agreements to be eligible to receive the remodel funds and continue operating, or else lose its business entirely.

49.     When Absolute Wireless communicated its concerns about the Agreement, T-Mobile stated it does not entertain redlines and all documents were non-negotiable, effectively presenting contracts of adhesion that, due to T-Mobile's fraud and deceptive conduct, Absolute Wireless had no option but to sign.

50.     As a practical matter, T-Mobile knew that Absolute Wireless had no choice but to sign the new Agreement. T-Mobile would hold Absolute Wireless and other dealers to the restrictions in the Sprint contracts (e.g., non-competition clauses), but would not allow Absolute

15

Wireless to sell T-Mobile branded products and services unless Absolute Wireless signed the new Agreement Package. This combination of circumstances would entirely deprive Absolute Wireless of the ability to meet its expenses of approximately $1.5 million per month in lease payments, payroll, taxes, and debt service.

51.     Prior to executing the Agreement Package, Absolute Wireless spoke with Mr. Scott Keen, Sprint's former Director of Dealer Channels who had been promoted to a similar Director position at the new T-Mobile. Specifically, in the second half of May 2020, Absolute Wireless directly asked Mr. Keen whether T-Mobile would institute any additional rounds of store closures.

52.     Mr. Keen assured Absolute Wireless that T-Mobile would not engage in another round of closures.

53.     According to T-Mobile's representatives, the closures were part of a "shrink to grow" strategy, pursuant to which T-Mobile would close – on a fair and reasonable basis – stores that were in close proximity to one another and then allow dealers, like Absolute Wireless, to grow by adding new locations in new areas. Indeed, multiple T-Mobile representatives repeatedly assured Absolute Wireless that T-Mobile was going to facilitate expansion and growth by Absolute Wireless.

54.     T-Mobile knew, but concealed from Absolute Wireless, that unless a dealer was a favored T-Mobile dealer, it would only be allowed (or more accurately, forced) to shrink, but never to grow. As Absolute Wireless was not a favored legacy T-Mobile dealer, Absolute Wireless experienced a mandated "shrink, but not grow" strategy forced by T-Mobile.

55.     Upon information and belief, at that time T-Mobile knew that it would make multiple additional rounds of closures of Absolute Wireless stores, and T-Mobile fraudulently concealed this fact from Absolute Wireless, including by instructing personnel, like Mr. Keen and

16

Cody Welker (another T-Mobile representative appointed to communicate with dealers like Absolute Wireless), not to disclose this fact to Absolute Wireless and other dealers.[9]

56.     Faced with an immediate reduction of its business after the merger and the direct threat of its remaining stores' operations grinding to a halt with nothing to sell, as well as the inability to negotiate terms and T-Mobile's false representations there would be no further store closures, Absolute Wireless signed the Agreement Package on May 7, 2020, which included the Agreement and the Wind Down Addendum. Also on May 7, 2020, the principals of Absolute Wireless, Messrs. Hartline and Burrow signed their individual personal guarantees.

57.     On or about May 28, 2020, T-Mobile placed on hold all dealer lease renewals and/or approvals until November 17, 2020, effectively causing leases to acquire holdover status and forcing Absolute Wireless to pay the holdover rent because T-Mobile refused to pay the holdover rent. T-Mobile provided no strategic support to Absolute Wireless to negotiate the leases with the landlords and allowed Absolute Wireless to continue suffering financially. Further, T-Mobile also prevented Absolute Wireless from moving any of its stores to new locations or from acquiring new stores.

**E.     The Agreement's Oppressive Terms.**

58.     The Agreement Package includes provisions that were false and/or oppressive, including: provisions that reduced Absolute Wireless's compensation, releases that were induced by financial coercion and distress, [10] overreaching non-competition provisions extended not only

---

[9] Upon information and belief, T-Mobile disregarded the advice of the real estate advisors upon which it normally relied in deciding which stores to slash.

[10] T-Mobile had a pattern and practice of applying financial and other pressure to sign releases. Upon information and belief, T-Mobile even sent them to low-level managers and were constantly applying pressure to dealers to sign such items as part of an obvious attempt to tie up loose ends and to try to avoid – under duress and without adequate consideration – consequences for fraudulent, unfair, and anti-competitive conduct.

17

to Absolute Wireless but also its principals, and misrepresentations that Messrs. Hartline and Burrow wanted to provide personal financial guarantees for the benefit of T-Mobile.

59.     Absolute Wireless only signed the documents containing these terms under extreme economic duress.

60.     The terms were ridiculously one-sided and, as Absolute Wireless now realizes, only with the benefit of hindsight, were intended by T-Mobile to enable T-Mobile to drive Absolute Wireless out of business.

61.     Moreover, T-Mobile purported to interpret and apply the Agreements to allow for a deliberate scheme to eliminate an unwanted dealer acquired via the Sprint merger by, e.g., eroding that dealer's footprint to such an extent that its once-thriving business reached the brink of financial ruin (which as explained below is exactly what T-Mobile did to Absolute Wireless), while relying on non-competition provisions that foreclosed any opportunity for the dealer to consider alternatives that might save it.

62.     For example, T-Mobile represented the length of the Agreement as a benefit to Absolute Wireless, but in reality, it benefitted only T-Mobile and gave it sufficient time to dismantle the business, while closing the exit door for Absolute Wireless.

63.     The T-Mobile Agreement included a provision allowing a party to close a store in the ordinary course, though Absolute Wireless required T-Mobile's consent to exercise the provision. The plain language, purpose, and intent of the provision was to allow for one-off closings of stores that were not performing well or were inconvenient to operate. However, T-Mobile adopted an untenable and unethical interpretation of the provision, namely, that T-Mobile could make a rounds of closures under the provision for T-Mobile's sole benefit. No

18

rational or fair person could interpret the agreement this way, as the prior need for a Wind Down Addendum to address significant closures indicated.

64.     Growth was entirely in the hands of T-Mobile, which gave itself sole discretion to approve or reject new store locations as well as the renewal of any existing store locations. In essence, such a provision tied Absolute Wireless's future to T-Mobile's good faith, which, it turned out, would be non-existent.

65.     T-Mobile also included provisions that supposedly permitted it to divert commissions to one or more creditors of dealers, including Absolute Wireless, who were T-Mobile affiliates when those affiliated unfairly reduced the dealers' credit limits for the apparent purpose of obtaining those commissions.

66.     The Agreement purported to allow termination only for material, uncured default and failure to cure. T-Mobile interpreted the Agreement to mean that it could evade this provision by relying on other provisions of the Agreement to effectively terminate Absolute Wireless's business without any uncured default by Absolute Wireless.

67.     If it truly had choices and had awareness of the lawlessness T-Mobile would seek to impose under guise of these putative contracts, why would any rational person sign such agreements?

**F.     T-Mobile Engaged in a Pattern and Practice of Anti-Competitive Behavior to Destroy Absolute Wireless and Instituted Additional Closures Despite Representations to the Contrary.**

68.     Shortly after the Sprint-T-Mobile merger, T-Mobile began engaging in a litany of anti-competitive, unfair and deceptive behavior aimed at driving Absolute Wireless and other legacy Sprint retailers out of the marketplace.

69.     T-Mobile manipulated search engine results to divert internet traffic and potential business away from Absolute Wireless and instead to preferred legacy T-Mobile retailers and

corporate stores. Specifically, T-Mobile was suppressing search engine results for Absolute Wireless locations so that they would not appear at the top of (or at all) in a search engine query even though the internet user was located in close or closest proximity to an Absolute Wireless store location.

70.     T-Mobile also refused to approve Absolute Wireless's requests to acquire new store locations, under the guise of a purported company-wide acquisition freeze. Upon information and belief, however, T-Mobile continued approving substantially similar acquisition requests by T-Mobile-favored retailers, and also continued opening new T-Mobile-owned corporate stores in close proximity to Absolute Wireless locations.

71.     Moreover, when the supposed acquisition freeze was over, T-Mobile continued to ignore or push off Absolute Wireless's requests for location and acquisition approval, despite continuing to approve acquisitions for favored dealers and opening new T-Mobile-owned corporate stores. In short, T-Mobile not only reduced Absolute Wireless's size, but also prevented it from recovering while supporting the growth of legacy T-Mobile dealers.

72.     T-Mobile also engaged in a series of actions to hinder the performance of Absolute Wireless's existing stores and later, upon information and belief, used those same performance metrics (which T-Mobile wrongfully suppressed) as a pretext to eliminate those stores.

73.     Finally, after Absolute Wireless executed the Agreement Package, T-Mobile began reducing or eliminating revenue streams that previously existed under the Sprint contracts and that T-Mobile never represented would be impacted or changed under the new Agreement Package. Specifically, T-Mobile reduced or eliminated residual payments, rural spiffs, and other forms of payment to Absolute Wireless, making it virtually impossible for Absolute Wireless to retain employees. T-Mobile also inequitably determined chargebacks and took an inordinate amount of

20

time to resolve chargeback issues, which hamstrung Absolute Wireless's ability to accurately document/forecast cash flow.

74.     Upon information and belief, T-Mobile planned to institute these changes prior to the execution of the Agreement Package but concealed this fact from Absolute Wireless to induce it to execute the Agreement Package.

75.     Against this backdrop, in November 2020, T-Mobile announced that it was instituting a second round of store closures and would be closing eight more of Absolute Wireless's remaining 47 stores.

76.     T-Mobile's announcement was contrary to its explicit representations via its Director Scott Keen in May 2020 that there would be no further Absolute Wireless store closures.

77.      T-Mobile stated that the additional closures were related to business judgment. However, the basis for any judgments T-Mobile made were its own improper and anti-competitive behavior, which prevented Absolute Wireless from performing to its potential, deflated its performance metrics, impeded its ability to operate existing stores optimally, and precluded any realistic opportunity for expansion or growth.

78.     Upon information and belief, T-Mobile disproportionately imposed the majority of closures upon legacy Sprint dealers as part of its plan to eliminate, and have its preferred legacy T-Mobile dealers subsume, the unwanted Sprint dealers it acquired via the merger.

79.     In short, relying on the Agreement (which it coerced and fraudulently induced Absolute Wireless to sign), T-Mobile eliminated Absolute Wireless's stores while simultaneously prohibiting Absolute Wireless from opening new locations (because T-Mobile withheld its approval) or opening stores for a competing carrier (because the fraudulently induced Agreement prohibited competition in any form). Consistent with its intent and design, T-Mobile's anti-

21

competitive, unfair, and deceptive conduct also ensured that Absolute Wireless's remaining stores could not operate at the levels they did prior to the Sprint-T-Mobile merger.

80.    Throughout its relationship with Absolute Wireless (and other legacy Sprint dealers), T-Mobile engaged in a pattern and practice of anti-competitive, unscrupulous, and unethical conduct, from which it then sought to immunize itself through unfairly-induced releases which were the product of misrepresentations, treachery, lack of consideration, and financial duress created by T-Mobile.

**G.    T-Mobile's Unlawful Conduct Forced Absolute Wireless to Exit a Business in Which it Had Flourished For 22 Years.**

81.    Before they were forced to do business with T-Mobile, Absolute Wireless's principals intended to either grow or maintain Absolute Wireless as a closely-held, essentially family business, or to grow the business and sell it for a profit. T-Mobile ruined either path for Absolute Wireless's future.

82.    Once it became clear that T-Mobile's actions would make it virtually impossible for Absolute Wireless to survive, let alone succeed or grow, Absolute Wireless had little choice but to exit the marketplace and sell its remaining business.

83.    Even at this stage, T-Mobile tied Absolute Wireless's hands: Absolute Wireless could only sell to two T-Mobile-approved buyers, and T-Mobile threatened that if Absolute Wireless attempted to sell to a dealer other than those two buyers, Absolute Wireless's request for approval of sale would go to the "bottom of the pile" and would not receive the same approval process that other dealers were getting from T-Mobile. Upon information and belief, T-Mobile encouraged these two specific buyers to acquire Absolute Wireless's assets by representing they could do so at a far lower price than those assets were worth.

22

84.     On October 7, 2020 Absolute Wireless and Verge Mobile, LLC ("Verge") executed an Asset Purchase Agreement ("APA"), which T-Mobile verbally approved. Relying on this approval, Absolute Wireless made extensive employee terminations or transitions and lease arrangements.

85.     As mentioned above, in November 2020, a month before closing of the APA, T-Mobile announced closure of eight more Absolute Wireless stores. Upon information and belief, T-Mobile closed these eight stores to drive down Absolute Wireless's value.

86.     T-Mobile decided to take one last shot at Absolute Wireless: approximately seven days before the closing date under the Verge APA, and despite already stating it would approve the APA, T-Mobile informed Absolute Wireless that T-Mobile would withhold final approval of the transaction unless Absolute Wireless executed an Assignment and Assumption Agreement that contained a putative general release of all of Absolute Wireless's claims against T-Mobile.

87.     T-Mobile intentionally waited to spring the release on Absolute Wireless until just prior to the scheduled closing of the APA, knowing that Absolute Wireless could not afford to refuse to sign the release and risk losing the deal. This roll-out of putative releases always came after the dealer was in no position to stop the sales transaction (which T-Mobile already fraudulently promised it would approve without additional conditions) because, among other reasons, related employee terminations or transitions and lease arrangements were already underway, and the selling dealer now faced a buyer who had rights against the selling dealer if it halted the transaction. And, in each case, the sale was only occurring in the first place because T-Mobile had devastated the selling dealer's business, thereby forcing the selling dealer to exit the business. Absolute Wireless's choices were simple: insolvency or fold to T-Mobile's unfair demands.

23

88.     Under immense pressure, Absolute Wireless executed the Assignment and Assumption Agreement and closed the APA on December 24, 2020. Due to T-Mobile's anti-competitive conduct and improper interference with that transaction evidenced by T-Mobile's closing of eight stores only a month before closing of the APA, the amount Absolute Wireless received was approximately $4 million less than the original amount the buyer was willing to pay.

**H.      Sprint, and Then T-Mobile, Maintained a Mislabeled Franchise Arrangement with Absolute Wireless.**

89.     Prior to the Sprint-T-Mobile merger, Sprint's relationship with Absolute Wireless was a mislabeled franchise relationship.

90.     Sprint's agreement with Absolute Wireless included a false statement that the relationship was not a franchise.

91.     After acquiring Sprint in the merger, T-Mobile unlawfully terminated the franchise with Sprint.

92.     Thereafter, T-Mobile's relationship with Absolute Wireless was a mislabeled franchise relationship.

93.     T-Mobile's Agreement with Absolute Wireless included a false statement that the relationship was not a franchise.

94.     Both Sprint and T-Mobile engaged in unlawful conduct directed at Absolute Wireless that violated applicable franchise law.

95.     Both Sprint and T-Mobile granted Absolute Wireless and its locations the right to offer, sell, or distribute goods and services – specifically Sprint and T-Mobile wireless services and associated cellular phone products – under a marketing plan or system prescribed in substantial part by Sprint and T-Mobile.

24

96.     That marketing plan included, without limitation, sales of Sprint- and T-Mobile-branded goods and services through a network of independent authorized retailers, of which Absolute Wireless was one, established by Sprint and T-Mobile in territories established by Sprint and T-Mobile to create a distribution grid for Sprint and T-Mobile. Absolute Wireless and other dealers were required to invest and take on substantial risk to commit them to the retailer and distribution programs established by Sprint and T-Mobile. Further, after the merger, T-Mobile forbade Absolute Wireless from making independent sales of accessories, which reduced Absolute Wireless's profitability by hundreds of thousands of dollars on a monthly basis. In fact, Absolute Wireless had approximately $700,000 worth of inventory that T-Mobile forbade it from selling, ultimately forcing it to dispose that inventory. Before the merger, Sprint required that Absolute Wireless purchase all accessories on a certain line of credit from either Brightstar Corporation[11] or Tessco Technologies Inc. After the merger, T-Mobile unjustifiably reduced Absolute Wireless's line of credit at least thrice causing enormous difficulties for Absolute Wireless to conduct its business.

97.     Absolute Wireless's operation was substantially associated with the trademarks, service marks, trade names, advertising, or other commercial symbols designating, owned by, or licensed by Sprint, T-Mobile, and their affiliates. Indeed, to a customer visiting an Absolute Wireless store, the store appeared to be a Sprint- or T-Mobile-owned store because of the extensive Sprint or T-Mobile signage and logos appearing on the employee uniforms -- all of which were mandated by Sprint and T-Mobile.

---

[11] In early 2014, Marcello Claure, the founder of Brightstar, joined Sprint's Board of Directors. Brightstar was founded by Sprint's former CEO Marcelo Claure, and owned by Softbank, for which Marcelo Claure was also an executive. Softbank, in turn, formerly owned a majority ownership in Sprint, and Mr. Claure served post-merger as the Chairman of T-Mobile's Board. During the onset of the COVID-pandemic, this incestuous T-Mobile-Sprint-Softbank-Brightstar-Claure conglomeration took actions that wreaked havoc on the finances of Absolute Wireless (and the legacy Sprint dealers generally).

98.     Absolute Wireless was required to pay to Sprint, and then to T-Mobile, directly or indirectly, franchise fees. Those fees included, without limitation:

a.  withholding substantial CSAs that Absolute Wireless had earned as a Sprint dealer and was entitled to be paid as a condition of Absolute Wireless doing business with T-Mobile;

b.  improper and unauthorized chargebacks against Absolute Wireless's commissions due from Sprint and T-Mobile;

c.  the improper withholding of Absolute Wireless's earned CSAs or residuals post-merger;

d.  the forced-purchase of furniture, uniforms, services, phones, and accessories from Sprint- and T-Mobile-selected vendors, including Granite Communications and Brightstar, which vendors, upon information and belief, provided these goods and services to Absolute Wireless at a substantial mark-up that was directly passed on to Sprint or T-Mobile;

e.  the assessment of charges labeled as "penalties" or "fines" for items such as missed training for employees, staff shortages, or findings in audits conducted by or on behalf of Sprint or T-Mobile;

f.  the required surrender of returned phones to Sprint or T-Mobile without any refund to Absolute Wireless for any portion of the phones;

g.  Sprint's and T-Mobile's receipt of funds from vendors in return for allowing those vendors to advertise in Absolute Wireless stores;

26

    h.   charges for Absolute Wireless's sales of accessories (which did not reflect mere

        wholesale sales of accessories to Absolute Wireless by Sprint and T-Mobile at

        wholesale);

    i.   markups on shipping fees; and

    j.   backend charges for co-op parts.

99.    Both Sprint and T-Mobile failed to properly register as required for franchise relationships and abused the franchise relationship with Absolute Wireless. Further, Defendants unlawfully terminated the Sprint franchise with Absolute Wireless when they forced the less favorable T-Mobile franchise relationship upon Absolute Wireless.

**I.    T-Mobile is Liable for Sprint's Unlawful Conduct.**

100.    T-Mobile (or a parent company of T-Mobile) is the successor entity or parent of Sprint.

101.    As the acquiring entity, T-Mobile is liable for actions or inactions of Sprint occurring before or in connection with the Sprint-T-Mobile merger.

102.    Further, as between Sprint and T-Mobile, there was a commingling of property rights or interests, and it was apparent that they were intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others.

103.    Moreover, Sprint and T-Mobile conspired together and aided and abetted one another to perpetrate the unlawful and wrongful actions and inactions that are the subject of this Complaint.

**J.     The Putative Releases Contained in the Sprint and T-Mobile Contracts are Unenforceable.**

104.    The putative releases in the Wind Down Addendum and Agreement and the Assignment and Assumption Agreement were fraudulently or unlawfully obtained and are unenforceable.

105.    All releases lack consideration. For the putative Wind Down Addendum and Agreement, T-Mobile compelled Absolute Wireless to forego its existing Sprint contractual benefits and granted Absolute Wireless nothing in return beyond what Absolute Wireless was already entitled to receive. For the putative Assignment and Assumption release, T-Mobile had already given verbal approval of the APA. The last-minute purported releases were unilaterally imposed on the APA by T-Mobile, were not proper or authorized requirements for the APA process, and in exchange for executing them Absolute Wireless received nothing to which it was not already entitled.

106.    Separately, T-Mobile acquired the purported releases through unlawful coercion and duress it imposed on Absolute Wireless, which independently renders the releases unenforceable. For the putative Wind Down Addendum and Agreement releases, T-Mobile threatened the destruction of Absolute Wireless's business if it did not sign, while simultaneously claiming Absolute Wireless was still bound by its non-compete, chargeback, and other obligations under the Sprint dealer agreement. Absolute Wireless had millions of dollars in recurring obligations for lease payments, personal guarantees, wages, operating expenses, and debt service, and it faced a simple choice: sign T-Mobile's rushed, non-negotiable adhesion contracts or go bankrupt. Similarly, for the putative Assignment and Assumption release, T-Mobile waited until the eleventh hour before the closing of the APA to produce the 2021 release and demand Absolute Wireless sign it, knowing full well that Absolute Wireless could not afford to lose the APA or

28

delay the APA's closing while it challenged T-Mobile's improper demand for a release. T-Mobile sprung the putative release contained in the Assignment and Assumption agreement seven days before the date set for closing, forcing it to sign or else forego receiving written approval for the sale.

107. T-Mobile's modus operandi was to (1) first verbally approve dealers' sale of assets, like it did with Absolute Wireless, and (2) wait until the last minute to spring the release, at which point T-Mobile knew Absolute Wireless would be in no position to stop the sale because it had made extensive final decisions such as employee terminations or transitions and lease arrangements, and Absolute Wireless would face a buyer who had rights against it if it halted the transaction. Like the initial putative release, here too, Absolute Wireless's choices were insolvency or fold to T-Mobile's unfair demands.

108. T-Mobile also induced all releases by fraud. T-Mobile affirmatively misrepresented its intentions (and concealed its true intentions) regarding store closures, lease renewals, growth, and support from the outset. Then, after intentionally devastating the businesses of dealers like Absolute Wireless, T-Mobile fraudulently represented it had approved the dealers' sales of their remaining assets to another T-Mobile dealer, but knew it intended to threaten to retract its approval at the last minute unless the selling dealer released all claims against T-Mobile. In short, T-Mobile acquired all the releases through unfair and deceptive practices, improper coercion and fraud, and without giving valid consideration, which renders the releases void as a matter of law.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF: FRAUD AND FRAUDULENT INDUCEMENT

109. Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

29

110. T-Mobile knowingly made the false representations to Absolute Wireless that it would not subject Absolute Wireless to another significant reduction of its stores after the initial closure of 10 stores and would allow Absolute Wireless to expand and grow.

111. T-Mobile further concealed its plans to massively cut Absolute Wireless's number of locations, suppress its ability to succeed, and stifle its growth.

112. These representations and concealments were material and false.

113. Absolute Wireless entered into the Agreement based on T-Mobile's representations that it would not subject Absolute Wireless to additional store closures and that Absolute Wireless would be allowed to acquire new stores and grow its number of locations following the merger.

114. T-Mobile knew that the representations were false and it acted in reckless disregard as to the truth or falsity of the representations.

115. T-Mobile knew at the time it made the representations that it intended to close far more of Absolute Wireless's stores that it represented, and that it would do so within the first 6 months of the Agreement.

116. T-Mobile made these misrepresentations and concealments of material facts with the intent to deceive Absolute Wireless, and they were made as a material inducement to Absolute Wireless to enter into the Agreement.

117. Absolute Wireless was deceived by the misrepresentations and would not have entered into the Agreement but for the misrepresentations.

118. Absolute Wireless could not have learned the true facts through reasonable diligence, and as a result, its reliance on T-Mobile's misrepresentations was justified and reasonable.

119. T-Mobile's fraudulent misrepresentations and concealments of material fact induced Absolute Wireless to forego the more beneficial terms of the Sprint contract and cheated Absolute Wireless out of compensation to which Absolute Wireless was entitled under the Sprint contract.

120. As a direct and proximate result of T-Mobile's fraudulent misrepresentations, Absolute Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $30 million.

## SECOND CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION
## (IN THE ALTERNATIVE)

121. Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

122. Absolute Wireless pleads negligent misrepresentation in the alternative to fraud and fraudulent inducement.

123. As alleged herein, T-Mobile supplied misinformation (by direct statement and concealment that misled Absolute Wireless concerning the nature of the T-Mobile-Absolute Wireless relationship), including regarding future growth and store closures, which information was material, false, and misleading.

124. T-Mobile knew that supplying this information to Absolute Wireless would induce Absolute Wireless to execute the new Agreement Package, and in supplying this information T-Mobile intended to induce Absolute Wireless to do so.

125. T-Mobile was negligent in obtaining and communicating this false information to Absolute Wireless.

126. Absolute Wireless reasonably relied on this false information in deciding whether to execute the Agreement Package.

127.    T-Mobile's false information proximately caused damages to Absolute Wireless.

128.    As a result of T-Mobile's negligent misrepresentations, Absolute Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $30 million.

### THIRD CLAIM FOR RELIEF: DECLARATORY JUDGMENT

129.    Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

130.    There is an actual and justiciable controversy among the parties regarding the matters set forth in this lawsuit.

131.    The law, justice, and equity require a determination and declaration that, as a result of Sprint's and T-Mobile's fraudulent inducement of the Agreement, they are invalid, void, and of no effect, and Absolute Wireless therefore remains in contract with Sprint and is entitled to the rights, privileges, and payments, and has only the obligations set out in, the Authorized Representative Agreement between Sprint and Absolute Wireless.

132.    The law, justice, and equity require a determination and declaration that, as a result of Sprint's and T-Mobile's fraudulent inducement of the Agreement and unequal bargaining power, the choice of law provisions contained therein are void and without effect.

133.    The law, justice, and equity require a determination and declaration that the putative releases contained in the Wind Down Addendums, Retailer Service Agreements, and the Assignment and Assumption Agreements were procured through fraud, and/or unfair and deceptive business practices, and/or improper coercion and economic duress, and/or are not supported by valid consideration, and are therefore void and without effect.

134.    The law, justice, and equity require a determination and declaration that the relationships between Sprint and Absolute Wireless, and then T-Mobile and Absolute Wireless,

32

were franchise relationships, such that Absolute Wireless is entitled to the benefits of a franchisee under applicable law.

### FOURTH CLAIM FOR RELIEF: BREACH OF SPRINT CONTRACT (AUTHORIZED REPRESENTATIVE AGREEMENT)

135.    Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

136.    If the Court determines that the Sprint contract remains in place, T-Mobile's and Sprint's conduct as alleged herein breached that contract.

137.    T-Mobile's and Sprint's conduct is the actual and proximate cause of damages to Absolute Wireless.

138.    Absolute Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $30 million.

### FIFTH CLAIM FOR RELIEF: BREACH OF WIND DOWN ADDENDUM AND T-MOBILE AGREEMENTS

139.    Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

140.    If the Court determines that the Wind Down Addendum and Agreement remain in place, T-Mobile's and Sprint's conduct as alleged herein breached those contracts.

141.    T-Mobile's and Sprint's conduct is the actual and proximate cause of damages to Absolute Wireless.

142.    Absolute Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $30 million.

### SIXTH CLAIM FOR RELIEF: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

143.    Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

33

144. To the extent the Agreement is deemed to be a valid contract that T-Mobile did not fraudulently induce, then T-Mobile is obligated by contract and common law to act in good faith and to not do anything to deprive Absolute Wireless of the fruits and benefit of the Agreement.

145. T-Mobile breached this implied covenant of good faith and fair dealing and injured Absolute Wireless's right to receive the benefits of the Agreement by engaging in the conduct described herein, including, without limitation:

a. Systematically eliminating a disproportionate share of Absolute Wireless's stores within the first 6 months of the Agreement;

b. Refusing to approve additional Absolute Wireless stores and building corporate stores in proximity to existing Absolute Wireless locations; and

c. Otherwise suppressing Absolute Wireless's ability to succeed as described herein.

146. T-Mobile's actions are contrary to Absolute Wireless's reasonable and justified expectations under the Agreement.

147. T-Mobile's sweeping reduction of Absolute Wireless's stores and refusal to approve additional stores frustrate the essential purpose of the Agreement and Absolute Wireless is unable to obtain its full and expected benefits of the Agreement, including without limitation, operating as a dealer of T-Mobile services and goods.

148. T-Mobile used the Termination of Locations provision to constructively gut the essential purpose of the Agreement and to bind Absolute Wireless and its owners to a non-compete agreement where they could not compete in the marketplace, all while T-Mobile continued to systematically eliminate Absolute Wireless stores, refused to allow Absolute Wireless to open new

34

stores, and engaged in anti-competitive, unfair, and deceptive trade practices to guarantee that Absolute Wireless's remaining stores failed.

149.    T-Mobile never intended to work with Absolute Wireless. It only wanted signed Agreements that would constrain Absolute Wireless and hopefully obviate Absolute Wireless's ability to defend itself. Further, as T-Mobile possessed Absolute Wireless's financial information, it knew before Absolute Wireless signed the Agreement that its actions would effectively close down Absolute Wireless.

150.    T-Mobile's abrupt and systematic reduction of Absolute Wireless's stores, refusal to approve additional store acquisitions, and anti-competitive conduct to destroy Absolute Wireless's remaining stores caused Absolute Wireless to suffer damages in an amount to be determined at trial, but certainly in excess of $30 million.

### SEVENTH CAUSE OF ACTION: VIOLATION OF WASHINGTON UNFAIR BUSINESS PRACTICES—CONSUMER PROTECTION ACT, RCW §§ 19.86.010 ET SEQ.

151.    Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

152.    T-Mobile engaged in unfair and deceptive trade practices including, among other things, the following:

> a. Making false representations to induce Absolute Wireless to sign the Agreement and coercing Absolute Wireless to do so or else forego the ability to sell any T-Mobile phones or services;
>
> b. Engaging in anti-competitive conduct to disadvantage and drive out Absolute Wireless (and other legacy Sprint dealers) while not subjecting legacy T-Mobile dealers to such conduct;

35

    c.  Weaponizing the commercial relationship and knowingly applying contractual terms in an unfair and improper manner contrary to the language and spirit of the contracts, for the specific purpose of suppressing Absolute Wireless and driving it out of business; and

    d.  Representing in the Agreement that no franchise relationship would be created but in fact, creating such a franchise relationship with Absolute Wireless, thereby manipulating the contractual relationship and abusing Absolute Wireless as a franchisee.

153.   T-Mobile's unfair and deceptive trade practices affect trade and/or commerce given that T-Mobile is engaged in the sale of assets, services, and commerce that directly affect the people of Washington state.

154.   T-Mobile's unfair and deceptive trade practices affect the public because:

    a.  T-Mobile committed its anti-competitive acts in the course of its business;

    b.  T-Mobile's actions were part of a pattern or generalized course of conduct which involved the intentional devastation of dealers like Absolute Wireless;

    c.  T-Mobile's conduct is not isolated – it has engaged in a pattern and practice of committing the wrongful actions and inactions addressed in this Demand – and is harmful to wireless dealers, employees, and customers;

    d.  T-Mobile has driven several viable and successful businesses out of the marketplace;

    e.  T-Mobile has not complied with the letter and spirit of the representations that it made to state and federal authorities to obtain approval of the Sprint-T-Mobile merger;

36

    f.   Given T-Mobile's pattern, there exists an ongoing potential for T-Mobile to continue its unlawful conduct; and

    g.   T-Mobile's actions have affected and continue to affect a large number of consumers.

155.    T-Mobile's unfair and deceptive conduct is the actual and proximate cause of injury to Absolute Wireless and has caused damages to Absolute Wireless in an amount to be determined at trial, but certainly in excess of $30 million.

156.    Absolute Wireless is entitled to an award of damages caused by T-Mobile's unlawful conduct, including reasonable attorneys' fees and statutory treble damages as provided by RCW 19.86.090.

### EIGHTH CAUSE OF ACTION: VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN. §§ 47-18-101, *et seq.*

157.    Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

158.    Absolute Wireless pleads violations of Tennessee's Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.* ("the Act") in the alternative to the Washington Unfair Practices claim.

159.    Defendants were, at all times material to the allegations herein, engaged in "trade" and "commerce" as defined by the Act. Tenn. Code Ann. § 47-18-103(20).

160.    T-Mobile is responsible for its own unfair acts and practices. Further, as the acquiring entity and a co-conspirator of Sprint's, T-Mobile assumed or is responsible Sprint's liabilities.

161.    T-Mobile engaged in unfair and deceptive conduct, as described herein. Specifically, without limitation, T-Mobile violated Tenn. Code Ann. Section 47-18-104(b)(8) as

37

it disparaged the business of Absolute Wireless by manipulating search engines to divert internet traffic from Absolute Wireless stores and intentionally delaying installing T-Mobile-branded signage to Absolute Wireless stores after the merger which was intended to and did confuse consumers as to the nature of the services offered by Absolute Wireless and which resulted in Absolute Wireless's potential (and existing) customers not doing business with Absolute Wireless.

162.    Sprint and T-Mobile also made false and/or misleading representations of facts and engaged in business suppression activities that constitute unfair and deceptive trade practices in violation of Tennessee law. In particular, as described above and incorporated herein by reference, Defendants' misconduct included, among other things: creating undue economic pressure to force the signing of agreements; lying about and concealing the number of store closures contemplated by T-Mobile; the financial incentives that Absolute Wireless would receive if it signed the Agreements; Absolute Wireless's likelihood of success of being a T-Mobile franchisee; conspiring with others to drive down the value of the business of Absolute Wireless; and interfering with the free market and engaging in anticompetitive measures that depressed the sales value of Absolute Wireless.

163.    Because it relied upon Sprint's and T-Mobile's representations, Absolute Wireless was tricked into entering into the various agreements alleged herein and investing significant money and effort, and Absolute Wireless suffered significant harm because of the unfair and deceptive suppression activities.

164.    T-Mobile's unfair and deceptive conduct caused independent harms to consumers in Tennessee and to Absolute Wireless.

165.    T-Mobile's unfair and deceptive conduct is the actual and proximate cause of injury to consumers in Tennessee and to Absolute Wireless. T-Mobile's unfair and deceptive conduct has

38

caused Absolute Wireless to suffer an ascertainable loss in an amount to be determined at the final trial, but certainly in excess of $30 million.

166.     Absolute Wireless requests judgment against Defendants for damages, together with attorney's fees and costs of suit pursuant to Tenn. Code Ann. §47-18-109(a)(1), §47-18-109(e)(1), and treble damages pursuant to Tenn. Code Ann. §47-18-109(a)(3), and such other and further relief as the Court may deem proper.

### NINTH CAUSE OF ACTION: VIOLATION OF WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT, RCW §§ 19.100.010 ET SEQ.

167.     Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

168.     Sprint was a franchisor and unlawfully sold an unregistered franchise in the State of Washington in contravention of RCW 19.100. Upon information and belief, Sprint failed to file a Notice of Claim for Exemption under WAC 460-80-100 and, in any event, was not exempt from registration requirements.

169.     Likewise, T-Mobile is a franchisor and T-Mobile unlawfully sold an unregistered franchise in the State of Washington in contravention of RCW 19.100. Upon information and belief, T-Mobile has failed to file a Notice of Claim for Exemption under WAC 460-80-100 and, in any event, is thus not exempt from registration requirements.

170.     As the acquiring entity, T-Mobile assumed Sprint's liabilities.

171.     T-Mobile's business model and mode of operation is in fact a "franchise" as defined in RCW 19.100.010(6)(a) in that:

> a. T-Mobile granted Absolute Wireless rights to engage in the business of offering, selling, and distributing goods and services under marketing plans pre-designed by T-Mobile;

39

b. the business opportunity granted to Absolute Wireless was substantially associated with a trademark, trade name, and other commercial symbols owned by T-Mobile; and

c. T-Mobile collected disguised franchise fees from Absolute Wireless, which included, *inter alia*, Absolute Wireless's CSAs, forcing Absolute Wireless into a consignment model whereby Absolute Wireless was forced to buy accessories from a particular vendor and then sell at T-Mobile's prices with substantially reduced margins and forcing Absolute Wireless to buy phones from T-Mobile and no other source.

172. Specifically, and without limitation, T-Mobile acted unfairly and deceptively and engaged in an unfair method of competition in violation of RCW 19.100.180, by:

a. Failing to deal with Absolute Wireless in good faith;

b. Requiring Absolute Wireless to purchase goods or services from T-Mobile or from an approved source of supply in the absence of any lawful purpose justified on business grounds;

c. Unreasonably and arbitrarily discriminating between legacy T-Mobile dealers and legacy Sprint dealers, such as Absolute Wireless, in business dealings;

d. Requiring Absolute Wireless to assent to a release or waiver which would relieve T-Mobile from liability imposed by RCW 19.100.180;

e. Unreasonably and unnecessarily imposing on Absolute Wireless standards of conduct such as forcing Absolute Wireless to purchase security equipment that complied with only T-Mobile's specifications, mandating that new hires be

40

approved by T-Mobile, and mandating a minimum number of people on sales floors at all times;

f.  Refusing to renew without fairly compensating Absolute Wireless for the fair market value and good will;

g.  Threatening to and actually terminating Absolute Wireless's stores before the expiration of their terms without good cause; and

h.  Acting inconsistent with representations made to federal and state authorities concerning commitments not to shut down productive stores or reduce employment.

173.  As a result of T-Mobile's violations of franchise law, Absolute Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $30 million.

174.  Absolute Wireless has suffered damages by reason of T-Mobile's violation of RCW 19.100 and is entitled to an award of damages thereof, including statutory treble damages as provided by RCW 19.100.190(3).

## TENTH CAUSE OF ACTION: CIVIL CONSPIRACY

175.  Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

176.  Upon information and belief, Defendants, as co-conspirators, engaged in an unlawful scheme, which consists of the concerted course and pattern of conduct set forth with particularity above.

177.  Defendants each had the intent and knowledge of the other's intent to harm Absolute Wireless.

178.  Defendants have intentionally and maliciously engaged in improper and tortuous conduct and activity for their joint benefit and gain, and to the detriment and harm of Absolute

41

Wireless, which consists of the concerted course and pattern of conduct set forth with particularity above.

179.    Absolute Wireless has suffered monetary damages to be determined at trial, but certainly in excess of $30 million as a direct result of Defendants' conspiratorial conduct.

180.    In light of the intentional and malicious nature of Defendants' conduct, an award of punitive damages should be entered.

## ELEVENTH CAUSE OF ACTION: UNJUST ENRICHMENT, QUANTUM MERUIT, OR DISGORGEMENT

181.    Absolute Wireless realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

182.    To the extent a contractual relationship is found to no longer exist between Defendants and Absolute Wireless (because the Sprint contract has expired and the T-Mobile contracts are invalid), the Court should compensate Absolute Wireless for its services, and the loss of its stores under the theories of unjust enrichment, quantum meruit, and/or disgorgement.

183.    Defendants received a benefit from the operation of stores and sales of Defendants' goods and services and in forcing Absolute Wireless to close its stores.

184.    These benefits were conferred at Absolute Wireless's expense.

185.    Under the circumstances, it would be unjust for Defendants to retain the benefit without fairly compensating Absolute Wireless.

186.    Further, T-Mobile should have to disgorge benefits flowing from its fraud.

187.    Absolute Wireless is entitled to compensation or disgorgement in an amount to be determined at trial, but certainly in excess of $30 million.

### PRAYER FOR RELIEF

Accordingly, Absolute Wireless respectfully requests that the Court:

A.    Award judgment in favor of Absolute Wireless and against Defendants on each of Absolute Wireless's causes of action;

B.    Award Absolute Wireless its actual damages, which exceed $30 million, plus statutory treble damages, punitive damages, attorneys' fees, and costs as pursuant to statutory authority mentioned herein;

C.    Afford Absolute Wireless a trial by jury on all claims alleged herein; and

D.    Grant Absolute Wireless such other and further relief as is just and proper.


Respectfully submitted this 23rd day of December, 2021.



Richard J. Keshian (TN No. 033726)
Dustin T. Greene, of counsel
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 607-7300
Facsimile: (336) 607-7500
rkeshian@kilpatricktownsend.com
dgreene@kilpatricktownsend.com

Joseph Dowdy, of counsel
KILPATRICK TOWNSEND & STOCKTON LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Telephone: 919 420 1718
Facsimile: 919 510 6120
JDowdy@kilpatricktownsend.com

*Counsel for Plaintiff Absolute Wireless of Tennessee LLC*

43



quadient

FIRST-CL

$010

12/23/202
043M3902

# FIRST CLASS MAIL

9414 7266 9904 2160 3655 54

Sprint Solutions Inc d/b/a TMOBILE
c/o Corporation Service Company
2908 Poston Avenue
Nashville, TN 37203
US



Lynn Charbonneau
Kilpatrick Townsend & Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101
US